Good morning, ladies and gentlemen. We are ready for argument in Bevis v. City of Naperville and some consolidated cases. Ms. Hunker. Good morning, Your Honors, and may it please the Court. I am Deputy Solicitor General Sarah Hunker, and today I will be presenting argument on behalf of the State Parties, the City Parties, and the Naperville Parties. Jessica Scheller will be presenting argument on behalf of the Cook County Parties. She will be prepared to answer any questions specific to Cook County and otherwise plans to present argument on issues raised in their briefing, such as historical analogs like gunpowder restrictions and other issues related to the scope of the Second Amendment. With respect to my presentation, unless the Court has a contrary preference, I will begin with the plain text of the Second Amendment and then turn to the historical tradition, each of which provides an independent basis for this Court to affirm the Bevis and Herrera denial of preliminary injunctive relief and reverse the Barnett Court's grant of a preliminary injunction. We know from Bruin that courts must begin by assessing whether the regulated instrument is protected by the plain text of the Second Amendment. We also know from both Bruin and Heller that not all instruments fall within that category. The instruments must be armed, they must be bearable, and they must be in common use for self-defense. The instruments at issue here do not satisfy that standard for at least two reasons. First, large capacity magazines are not armed. They are accessories that are not necessary for the operation of any firearm. And I take it when you say that, you understand some sort of ammunition feeding device needs to be there, but it could be a 10-round device, not a 30-round or something bigger. Yes, of course, Your Honor. At issue here are only the large capacity magazines that are restricted by the Act. The Act does not restrict anybody's ability to use a magazine to operate their firearm. And because the record here plainly shows, and it's unrebutted by the plaintiffs, that there is no need for a magazine in excess of 10 rounds for rifles or 15 rounds for handguns, that they do not constitute an arm under the Second Amendment. Even however, if that were not the case, large capacity magazines and assault weapons fall outside of the plain text because they are not in common use for self-defense. There's much discussion, Ms. Hunger, about a burden. I think the state, the county, Naperville, all place a burden on the petitioners for purposes of establishing this first step. Where is that found? What's the authority for that? In Bruin, there are several if-then statements that says if the weapon is within the plain text of the Second Amendment, then the government bears the burden of demonstrating that it's consistent with historical tradition. If the government bore the burden at both steps of the analysis, then the Supreme Court would not have used that language. Well, Bruin is clear that the government's got a role here on the second step. It says so. Bruin never says the burden shifts from petitioners to respondents. We're left wanting for the source of authority as to why a burden on the first step would be on the petitioners. Well, I suppose the burden does have to be on somebody. And we know that the government does bear the burden at the second step. And as I said, there is that kind of if-then language. But regardless here, whoever's burden it is, our position is, even if it were the government's burden, that these are not in common use for self-defense. That's because assault weapons make up only 5% of the arms in circulation. And they're owned by only 2% of Americans and 8% of gun owners. Before we get too far down that path, which we certainly should come back to because there's a great debate going on about what we're talking about when we talk about common use. Are we talking about numbers? Are we talking about purpose? Are we talking about percentages? And to what extent do we anchor this in a particular point in time? But I want to back up and ask you what the state's definition of a bearable arm is. Does that mean something you can carry? Or does that mean something that we're ordinarily in 1791 in someone's household? What's a bearable arm? Our view is that it likely would mean something that someone could carry. And that is why it is our view that it is not an appropriate standard for the plain text step and why it makes more sense to look at whether or not something is in common use for self-defense. Or else you could literally have shoulder-fired rocket launchers would count as bearable arms. And then you have to go into the second step of the analysis and do this huge historical inquiry when everyone knows those are military-grade weapons that are not protected by the Second Amendment. Well, I take it your opponents concede that even M-16s are not the kinds of arms that the Second Amendment protects for personal use for self-defense. That's correct. And that's a really important point, Your Honor, because assault weapons are virtually identical weapons to M-16s but for one thing, which is that M-16s can use automatic fire instead of semi-automatic fire. And sure, that is a distinction, but it is not one that's constitutionally determinative. If you look at what Heller said about M-16s, the reason why the state may ban them is because they're weapons of war. It's not because they use automatic fire. And so, yes, plaintiffs have identified that distinction, but they have not explained why it's important. And we think here, given that we know that the state and the federal government can ban automatic weapons like M-16s and because assault weapons are essentially M-16s, we think it could be a relatively simple case on that line alone. But, of course, our view is also that we have shown, even though we do not believe it's our burden, that these are not in common use for self-defense and also that they are consistent with the historical tradition of regulating dangerous and unusual weapons. So, again, back to Judge Brennan's question, regardless of who carries the burden here, we believe that the state should prevail. And I would also note that this is at a preliminary injunction stage where the plaintiffs carry the burden to show that they are likely to succeed on the merits. And here, you know, the plaintiffs have presented virtually no evidence in support of their case. And the state and the city and the county and the city of Naperville have come in with dozens of declarations from historians, from doctors, from medical experts to meet each step of the burden, regardless of where it falls. Can I ask you another question? Everybody here has been assuming, it seems to me, that in the wake of Bruin, we have this two-part test. First of all, looking at the plain text of the Second Amendment, and if the weapon in question seems to fall within that plain text, then there's a presumption of constitutionality which then is the state's, I'll just call it the state, the state's burden to rebut. So it's a two-step test. And I keep bumping into the fact that in Bruin itself, the Supreme Court said, the Courts of Appeals have been following a two-step test, but we think that's one step too many. And you know the line. I do know the line, yes. And so why are we back in a two-step test anyway? Well I have had a similar thought, but I think what the Supreme Court was saying there was that means and scrutiny is the step that's too far, but then of course, ironically, it did go back and say we're looking at the plain text, and then if that's satisfied, we look to history and tradition. And so maybe it's step 1A, B? I'm not quite sure, but it does seem like there are two parts to the test, even if technically we're out of the two-step test zone. But just to be clear, you just said a minute ago that it's the state's maybe preferred position, or at least I'm inferring that you mean preferred position, that you can look at the text of the Second Amendment, somehow discern from that word arms, you know, keep and bear arms, the notion that it's talking about non-military weapons, the kind of thing somebody would use for self-defense, perhaps lawful sporting purposes, you know, there's a set of lawful purposes. And that's enough that we somehow can intuit from those words in the Second Amendment, this classification. Well I do think if you look at, I believe it's the threshold paragraph in Bruin where Bruin discusses the plain text analysis, the court does discuss arms that are in common use for self-defense. The court could have said bearable arms or arms or something else, but it did not. And so we know that there's something more there than just is this literally a weapon in some capacity and can you carry it from one place to another. And so our view is that it makes the most sense to take that language that was used by the court and apply it. And we also think as a practical matter it makes sense because if you're looking at common use, you're looking at suitability, you're looking at intended purpose, which can also go whether or not something is military grade or is it used for criminal purposes. And our view is that those concepts are also inherent in this in common use for self-defense line that Bruin used in that threshold paragraph. I struggle with that argument though because in that paragraph it connects the two petitioners, the people, it never though connects arms to in common use for self-defense. That's a lie. Well, it does say that handguns, which were the arm at issue in that case, are in common use for self-defense. So I think that's the connection. But you're right, it doesn't say the definition of arm is in common use for self-defense. I think there's a lot in Bruin that we have to kind of look to and interpret. And so from our perspective that is the language that's used in Bruin and it does actually make sense as well as a practical matter when courts are looking into what does this plain text inquiry mean. We've got to look at this amendment in light of all the amendments. And I can't think of another constitutional amendment that would be approached in this We certainly don't read the First Amendment that way. We don't read the Fourth Amendment that way. I don't necessarily think that that's a narrow category. In common use for self-defense, for example, the court has already said, means handguns. It can also mean any number of other weapons. For example, the semi-automatic weapons that are not restricted by the act and that are in common use for self-defense in some ways. There are a lot of weapons out there. And we're talking about a very narrow group of weapons here. And so our view is that it's not unnecessarily or unduly narrow. And I would also note that even though the Second Amendment test is different in some ways than First Amendment or Fourth Amendment or Fifth Amendment, it's certainly not unheard of for the threshold question in some of those tests to be more significant, especially in any given particular case. That would involve either robust legal or factual analysis. For example, I know right now there is a big debate over cell phone encryption under the Fifth Amendment. Is that a statement? That's the threshold question. And that could be the one that the court is looking at more robustly in any specific type of case. If you're looking at dog sniffing cases under the Fourth Amendment, whether or not something is a search is a threshold question. And so while it might not be as robust of an inquiry or a slightly different inquiry, we don't think it's different in kind such that there cannot be some teeth to the plain text stuff. Can I ask, when you talk about arms in common use for self-defense, do you see this as an objective test? Do you see it as a subjective test? When somebody buys their AR-15, they say, well, I personally expect that I'll use this for self-defense. Is that enough to make it self-defense? Or do we need to look at statistics? How do we make sense of this? I don't think it's a person-by-person subjective test. But I do think what people generally use for self-defense is relevant. And we have several expert declarations. I believe it's the Andrew Declaration, Bussey, and Nergalaitis that say that Americans should typically choose other weapons for self-defense. They typically choose handguns and shotguns. And that's because they are more suitable for self-defense purposes. You can conceal them. You can maneuver them more quickly. And they are not overpowered in the way that assault weapons and large capacity magazines are for self-defense purposes. So I imagine it might be slightly different for each case. But yes, the court could look at statistics, intended use, expert declaration. Also here, just the history and nature and marketing of these weapons shows that they're offensive, militaristic weapons. That's what they were designed for. And that's how they are being used today. That's why they're being regulated by the state and these localities, because they are the perfect instrument for lone shooters with little to no training to take an assault weapon and large capacity magazines and murder people in minutes, if not seconds. And that wreaks havoc not only on those who are present through injury and death, but also the entire communities. They're very traumatic events. There are economic consequences. It's also a very significant burden on law enforcement. And so what is happening is these mass shooters are using them in offensive ways because that is what they were designed for, although, of course, they were designed for the battlefield. We spent quite a bit of time on the first step. Let's move to the second step. We're supposed to ask the how and the why, how the regulation burdens and why it burdens. Is there any why in support of the act that did not also apply to public carry in Bruin? Yes, Your Honor. I think this is a very specific why here, which is what I just discussed. We have these lone shooters that are taking these offensive militaristic weapons, these specific weapons, and they are using them to, you know, attack communities and public events. And I think that's different than the concealed carry why, which is more kind of interpersonal violence on a kind of a one-to-one level. Well, it's all gun violence. You're segmenting a portion of the gun violence and saying that's the why? It is. I don't think it would be sufficient for us just to say public safety, you know, generally. And that's not what we're saying. We have a very specific reason for having enacted these restrictions. And that why does line up to the why of the early 20th century with the restrictions on automatic and semi-automatic weapons, which I would note even plaintiffs do not dispute that that history is relevant here. And those are virtually indistinguishable from the restrictions here today. And we know from Heller and from Miller that those types of restrictions are permissible. Can I just interrupt and say, one of the big themes that your opponents urge in all of their briefing, and believe me, there's plenty of briefs filed in this case, is the fact that regrettable, I mean, horrible as it is that there are these mass shooting incidents, there are not that many of them compared to the number of people who own these weapons. And they say, why would you take away the guns from all of these other people who aren't going out there and shooting out of a hotel room just because some rogues are? A few responses to that, Your Honor. First, the number of mass shootings other experts have explained is unfortunately increasing. So there are a substantial number of these mass shootings in this country. I would also note that the... I must say, though, I don't understand how that's anything but an effort to get means ends scrutiny in through the back door. You're saying the state has a good reason for doing what it's doing. That's exactly what the means ends business is about. How can we, given what Ruin said about means ends arguments, how can we consider this? I think we can under the justification prong of what is relevantly similar. The court specifically asked to look at the how and the why, which it noted included the justification for the act. I understand that the court did also say that there cannot be any means ends scrutiny. So we are not asking the court to engage in any type of interest balancing or means ends scrutiny. We are presenting the justification for this act, and we are saying that it is relevantly similar. I hope you see you're just repeating the reason why I asked my question. You're asking us to consider through the back door something that ruined bars at the front door. I wonder whether that's consistent with our role as what the Constitution calls an inferior court. Well, it is consistent with Bruin because there's another door in Bruin, which is the justifications. I understand that that might be slightly contradictory for what the court would have said in Bruin, but it is what the court said. They did use the word justifications. So we not only get the two-part test that they expressly said was one court too many, but we also have the very same criteria that courts of appeals used before Bruin, even though they were expressly disapproved. Does your argument really hinge on this? It does not really hinge on this, but I would also note that the justification in the way that we see it fits into the historical tradition approach. But no, our argument does not hinge on this because these are not weapons in common use for self-defense. They are dangerous and unusual, and they are consistent with the historical tradition whereby states, the federal government, and other localities will regulate a weapon once it has been introduced into society, once it proliferates to the point where it is causing harm, and then the state comes in to regulate in that respect. So I take it you're saying there's no statute of limitations on the state. So a weapon can be introduced, and maybe the state doesn't realize right away that it's going to be a problem, and at some later time, the legislatures and the appropriate authorities in the state say, actually, it is turning out to be a problem. So there's no what has been called by some an easement. No, Your Honor. In our view, that is the way that governance should work, is that the state is only regulating when there is a problem. Otherwise, there would be overregulation by the state, and the state would feel the need as soon as any new weapon came on the market to regulate it immediately, or else it would lose the ability to do so. And I think that does not benefit anybody. It does not benefit the state or our residents or those who would like to use those weapons. I do see that I am going into my rebuttal time. Can I ask you one last question, though? You know, you've a couple of times referred to dangerous slash unusual, and there's been some side debate about whether something has to be both dangerous and unusual, whether it needs to be dangerous or unusual, unusually dangerous. I mean, you can play with these words as you wish, but it could make a difference, you typically the case for other guns of various kinds, other firearms, then maybe that's one thing. If usual just means how many of them can you count, then there are a lot of them out there. Everybody keeps using this number, 24.4 million. So what are we to make of that little phrase? So we view that term more as a term of art and not looking at is something unusual, a.k.a., you know, is it common? And that is consistent in our view with the history because there were weapons that were popular, like the automatic weapons or certain knives and clubs and pistols in the 19th century, but that were restricted, especially, you know, in the 19th century with respect to concealed carry and then possession requirements in the early 20th century. And the Supreme Court has noted that those are permissible. And they could not have done so if it were the case that any type of popular weapon could not be dangerous and unusual. Thank you. Thank you. Thank you. Ms. Schreller. Ms. Schreller. Good morning and may it please the Court. My name is Assistant State's Attorney Jessica Schreller and I will be presenting arguments this morning on behalf of the county defendants. There are three independent bases upon which the Court may affirm the denial of Dr. Herrera's preliminary injunction beyond those discussed by the State in their presentation this morning. We would like to draw your attention to these points. The AR-15 sought by Dr. Herrera is not protected by the Second Amendment. It is not an arm as that term was interpreted by Heller. Next, the AR-15 is not protected as its use is not consistent with this nation's historical tradition of moderate self-defense. It is instead a dangerous and unusual weapon. And finally, this nation's historical tradition supports regulation of materials causing mass death even though it's protected by the Second Amendment such as gunpowder. Isn't the why for gunpowder, though, different than the why here? I'm on the second step of Bruin. Yes, of course. The why for gunpowder was to prevent fires and explosions. That's why they limited it, right? Isn't the why here different, whether it's public violence generally or a segment of public violence? We would disagree, Your Honor. The why in this particular instance is to prevent mass death caused by the carelessness or callousness of an individual or small group of actors. That is the same why which led to the regulation of gunpowder under the English common law and carrying through our nation's formation. You see how we might have some concern with that being overbroad. Yes. However, there is an additional why which supports this contention, and that is, as noted by Heller, gunpowder restrictions were in part to protect the firefighters who were coming onto the scene to help aid and render assistance. And similarly here, we have provided several instances where law enforcement officers responding to mass shooters armed with AR-15 are afraid to engage the situation or otherwise delayed in engaging the situation while they pull in military equipment such as a bear cat or a personnel carrier to breach the wall, or in the unfortunate circumstance of Uvalde where law enforcement did not engage at all due to fear of engaging with that particular weapon. So isn't Mr. Herrera's argument precisely that? He needs to be protected when as a SWAT medic he goes to the scene? Dr. Herrera is not a member of the SWAT team. He is a medic. However, if that was necessary as part of his participation in the SWAT team, it would certainly be outside of the prohibitions of our ordinance, and I suspect the other regulations as well. The Duke County ordinance does provide an exemption for law enforcement officers. So for Mr. Herrera's particular case, Dr. Herrera's particular case, you're indicating he could carry a weapon to the scene. Is that your position? No. I do not believe that Dr. Herrera is a law enforcement officer, nor do I believe he has put forth any evidence from any entity that he is required to carry this weapon as part of his duties related to his volunteer capacity in the SWAT team or state capacity, whatever the case may be. So you're just saying that if the SWAT team wanted him to have a weapon, he would fall within the exemption, that he's just in the truck basically? Correct. But turning back to our first argument, which I think is incredibly important for this court to consider, Helleran-Bruin instructed us first to look at the plain text of the Second Amendment, and so rather than calling it a two-step test, I will say the plaintiff is required to complete a prima facie case, bringing the prescribed conduct within the scope of constitutional claims. And he's failed to do so here. The threshold analysis on the merits must be whether the AR-15 spot by Dr. Herrera falls within the plain text of the Second Amendment. And put simply, it does not. As to the plain text analysis, Bruin is of limited utility, as the parties stipulated the Second Amendment applied to hands and regulations. However, Heller is both instructive and dispositive on the issues raised here. In Heller, the Supreme Court interpreted the operative clause of the Second Amendment, and before turning to the verb keep and bear, the court interpreted their object or arm at page 581. And applying a historical understanding, the court noted that arms in 1773 was understood to mean weapons of offense or armor of defense. However, the court went on and stated the term was applied then as now, meaning in 2008, to weapons that were not specifically designed for military use and were not applied in the military capacity. That's Heller at 582. And it's particularly deadly, to Dr. Herrera's claim here, when you look at the AR-15, how it was developed, why it was developed, and at whose request it was developed. In 1957, the U.S. government invited Armolite, a weapons manufacturer, to produce a lightweight, high-velocity rifle with firepower capable of penetrating a steel helmet or standard body armor at 500 yards. So you have actually spelled a lot of this out in your briefs, and so in the interest of time, I guess I'm having trouble, and my trouble extends to what your opponents are going to argue, too. As I stare at the language of the Second Amendment, there's a lot of interpretation that's necessary. I guess I'll just say that. Before you can understand what's the point of the prefatory clause, Heller said it doesn't drive the whole thing. Fine. There's an individual right. But what are the arms? What does it mean to keep and bear the arms? Who are the people? I mean, all of these are terms that require some interpretation. And in our case, unlike Heller, unlike Bruin, requires us to zero in on what are the arms. And I'm curious as to what you think the Supreme Court is telling us we need to do, whether we should just all become weaponry experts and apply our own understanding or whether there's some historical test, and that's a little hard to do since, as you were just saying, it's not until the 1950s that these particular weapons are fully elaborated. Then there are other people who say, oh, you know, they were repeating things back in the 15th century. But I think it's fair to say these are distinctive weapons. But how do we do this? I think there are two different questions that the court could ask itself in this particular circumstance. And the first is, it would look to Heller, which said that Miller stands for the principle that it is the characteristics of the weapon which determine whether or not it is protected. So now we're looking at weaponry. So we're all, just to pause, we are all still on the same page that when we see that word arms in the Second Amendment, we actually know that we have a sorting job. You know, maybe nuclear weapons are on one side of the sort and small handguns that many people keep for their protection are on the other side. And then there's just a myriad of other things. And so it's the sorting principle that I'm interested in. So I think the next step of the sorting principle would go to the historical legal traditions announced by Blackstone and carried forth through our nation's tradition of moderation in terms of self-defense. So Gruen, Heller, McDonald, all of these cases and all of these presidents stand for the notion that the core right is self-defense. And if we look to the founding scholars, there was always layered within the concept of self-defense the principle of moderation. That goes back to cases resolved by the King's bench, cases resolved at the time of the founding, and it carries forward through Illinois law to this day. There has always been a notion that you cannot use an excessive amount of force, even in self-defense, or it becomes a crime in and of itself. And so while Illinois law certainly doesn't govern the constitutional interpretation, it does inform this part of the nation's historical tradition with regard to regulation and how self-defense has been acknowledged and applied. And self-defense is not an unlimited right. It's not designed for someone to play commando with military-grade weaponry, but rather it's meant to defend against confrontation of some limited means, as acknowledged in Heller, which said that it's not designed to prevent any type of confrontation. But there is some type of right to defend oneself. And we think Blackstone is the touchstone to determine where the founders were and what their thinking was when the Second Amendment was enshrined. So what is your best argument for historical analog? Is it gunpowder? What are you relying on if you're putting forth your best foot on that stuff? We have two. If we're dealing specifically with regulations within the home, both gunpowder and spring gun are historical analogs. We believe gunpowder is an appropriate analog because the Y is a nice fit with regard to preventing mass death, but the spring gun is also a historical analog because that was certainly a firearm kept within the home to protect the home. And yet it was determined to be unlawful because of the indiscriminate way in which it would effectuate its remedy. It was protecting property, not personhood. Not necessarily. It was to protect against intruders. And it would be an unusual analysis if it was okay to ban something that could unintentionally harm third parties, but not to ban a similar problem where it's used with intent. There's simply no analog in the law for that type of logic split. And unless the court has any further questions, I see that I am close to my rebuttal time. Thank you. Thank you, counsel. Ms. Murphy. Good morning, your honors, and may it please the court. Erin Murphy, counsel for the Barnett plaintiffs. This morning I'm going to be prepared to address the four issues that are common across all of the appeals. Mr. Mag will then present argument on behalf of the Langley plaintiffs who are parties to the Barnett appeal, and Mr. Dickey will present argument on behalf of the Herrera plaintiffs and address the issues that are specific to the Herrera case and the city and county ordinance that are issued there. Millions of law-abiding Americans possess the semi-automatic rifles, pistols, and shotguns that Illinois has newly banned, and millions more own the magazines that Illinois has now declared illegal. Under the Supreme Court's decision in Bruin, that forecloses the state's effort to prohibit them, as Bruin teaches that our historical tradition is one of protecting arms that are in common use today. Your whole argument seems to depend on the word today, in common use today. So I'd like you to consider the ban on machine guns in 1938. Was that unconstitutional? Because in 1938, machine guns were in common use, much as the AR-15 is in common use now. I don't think so for two reasons. First, they actually were not nearly anywhere near as common as the AR-15s. As the state's own expert has said... There are a lot more weapons altogether now than then. Certainly, but as the state's own expert said, they were not particularly common at the time. But more importantly... They were especially common in Chicago. What Heller said is that the reason they could be prohibited is because they were not typically possessed by law-abiding citizens for lawful purposes. Those are the precise words that Heller used in the specific context of explaining why Miller was consistent with the historical tradition of prohibitions on dangerous and unusual weapons. The court said what was different about machine guns was they were not typically possessed by law-abiding citizens for lawful purposes. That is quite different from what we are talking about here today. Do we have data? On what basis was that statement made? The Supreme Court's statement? Yes. I'm assuming it was made on the record that existed before that they looked at themselves in terms of the historical record. But at this point, what we know is that at the time that machine guns started to be banned back then, there were only a few thousand of them that had been sold at all, which makes them exceedingly less common than anything we are talking about today. And they... Again, I would point you to the record. In this very case, the state's expert says they did not find a home with law-abiding civilians. They said principally found a home with gangsters and mobsters who were using them for criminal purposes. So it seems to be common ground here today at this point that the reason that those were the type of arms that could be used... Counselor, I hope you can see why it troubles me. Because if we have a historical inquiry under Bruin, why could it matter? Why should it matter what was in common use in the 1930s? Who owned guns in the 1930s? Or for that matter, who owns guns in the 2020s? It's not historical. It's a matter of current events. And normally we think that current events are for legislators. History is the domain of the Constitution. So as I understand, what Bruin is teaching is that we take historical principles and apply them to modern day facts. We take the historical principle that weapons that are in common use today are the types of arms protected by the Second Amendment. The answer... Where does that come from as a historical principle? That the Second Amendment protects whatever weapons are in common use whenever we choose to ask that question. It comes from page 2143 of the Supreme Court's decision in Bruin. Where they specifically... Now, where does it come from? Right? The fact that somebody may say something that you like is not where it comes from. What part of our constitutional history leads to that principle? It comes from looking at the historical tradition of what types of arms were banned. Comes from looking at it. Does it come from anything concrete in the historical tradition? Yes, the laws that existed historically. We look at the laws. That's what Bruin instructs us to do is look at the types of laws that existed historically and ask what types of laws... Looking at those laws, what types of arms were permissible to ban? And what... There are very few restrictions. The state points to many regulations. But there are very few laws in this country's history that prohibited particular types of arms. And when you look at those laws and you look at them and try to extrapolate from them, what is the basis that ties together the types of things that were prohibited? They were not arms that were in common use at the time. They were instead arms that were highly unusual in society at large and predominantly used for unlawful purposes. That is the historical tradition that's drawn from looking at historical laws. Which is what courts are supposed to do in the wake of Bruin. So do you think the only thing that's excluded are unlawful purposes? Because right now I'm struggling with what I understand to be your concession that the M-16, for example, is not one of the arms that's covered by the Second Amendment for the individual right to keep and bear. And that more broadly speaking, our standing army, which is some 1.4 million people these days, and probably would have horrified James Madison and any number of other people who didn't want a standing army, but we have one now, that there are certainly some weapons that in this country Congress can, the Department of Defense can, whoever we want the actor to be, can reserve to the professional military. And maybe by extension to police departments, but to keep out of the hands of ordinary citizens. Then there's some other set of weapons. So I guess you're saying unlawful purposes, but I think there's another point here, which is that some weapons, while not unlawful per se, perfectly lawful for a member of the Army to have his service weapon, but they are not for Second Amendment purposes the kinds of things that individuals can have. So I think the question is whether they're highly unusual in society at large. And when the court said society at large, I take them to mean ordinary law-abiding citizens, not members of the military or the police force. So let me ask you about this 24.4 million number then. I looked, and it was very hard for me to see how it broke down. How many of those weapons are actually owned by law enforcement agencies? How many of those weapons are in the hands of criminal gangs? How many of those weapons are in the hands of people like Dr. Ferreira, who has nothing that appears to suggest why he shouldn't have it? How does that number break down? I can't tell you precisely how that number breaks down. I will say, and that's partly because we don't believe that it is our burden to prove that something is not in common use or not typically used for lawful purposes today. I do think it's important to be clear about how we think methodologically all of this works in light of Bruins. I agree with that, but I guess I'm reminded of the old lies, damn lies and statistics idea in that we can look at that number, 24.4, let's maybe subtract some, call it 20 million since maybe some of them are these special uses. But then you look at other numbers and you say, oh my gosh, it's only 1% by the time you work through, and that makes it seem not common. There's no objective principle that tells us which way to think about commonality. Sure, I'd say a couple of things in response to that. First, anytime anyone on the Supreme Court has talked about it, they've talked about it in terms of numbers, just simple numbers of possession. But they've never faced this issue. It's been conceded that it was common use. So when the court, the court tells us all the time, if they weren't thinking of an issue, we really need to be careful about how much we read into what they say. Well, I do want to be clear that it wasn't irrelevant in Heller or Bruin. I mean, the question in Heller was whether a particular type of firearm maybe possessed a handgun. And the argument was made, you don't need to possess handguns because you can possess long guns. So everybody agreed a handgun was in common use. Everybody agreed, it was conceded, it says this in Bruin, that handguns are in common use. So how you derive the definition of common use from something that everybody agreed and therefore was untested in the adversary system is hard. Sure. And here's part of why I think it really needs to be a focus on numbers of ownership. Because if you use basically any of the other metrics that the state has offered in its briefing, you're probably going to end up having to say that revolvers aren't covered, that non-semi-automatic rifles aren't covered. I mean, their statistic for saying that rifles aren't covered is actually a statistic that these rifles that they've banned aren't covered is a statistic about all rifles. And I certainly don't think the Supreme Court would accept the proposition that the right metric for commonality is one that excludes rifles and a revolver, which is what Mr. Heller actually wanted to possess in Heller itself. And so you have to have a metric that is consistent with something that would protect the kinds of things that we think of as inordinary use by lawful citizens for self-defense, meaning things that people keep in their home that they practice with to be ready for self-defense. And, of course, there's variation among those numbers. But what we are talking about here, these types of rifles that the state has banned, they're the second most popular type of firearm on the market after semi-automatic pistols. They're three times more common than revolver sales. They're twice as common as shotgun sales, twice as common as non-semi-automatic. Going back to Judge Easterbrook's point about the Tommy guns and the like, I think just because – so your feeling is whatever it is that's popular – maybe grenades are going to be popular soon. That means that people have the right to keep and bear grenades? Grenades seem to strike me as something that is more arguably not a bearable arm in the sense of a firearm that – No, a grenade is an easily bearable arm. That's the whole point. Yeah, I mean – Right. One of the problems that I at least have with your presentation is that it makes the constitutionality of a law depend on where it was enacted, when it was enacted relative to sales. If there had been a statute in the 1950s when the AR-15 is invented, it would have been But if the state legislature waits 20 years, then the statute can't be sustained. All of that is totally extrinsic to either the language of the constitution or the history of the constitution. And I wonder how, if we have a historical test in Bruin, how that totally anachronistic approach can be the one required by the constitution. I would say two things. First, I don't think it is necessarily the case that simply because AR-15s weren't common at the moment they came out, they could be prohibited. There is a dangerous and unusual test. And while we feel very strongly that it's a conjunctive test, you need both things, that matters both – you have to be unusual, but also – But then you have to answer my machine gun question the other way, because I'm quite sure that for the same reason AR-15s are owned by many law-abiding people. Tommy guns would be owned by many law-abiding people today. And therefore, the 1938 statute has to be unconstitutional. But you're not willing to say that. I mean, it's just not consistent with the historical record. They were not common. Look, my proposition is counterfactual. It's the same as what happens if the AR-15 is banned in 1957. It's not common. But in litigation 20 years later, you would be saying law-abiding people would commonly own it, and therefore it has to be legal. And I'm now saying the very same thing about the Thompson submachine gun. Actually, you know, it's a submachine gun. Maybe it wasn't a real full machine gun. But you see the problem, I hope. But you're just fixed on saying the machine gun can be banned, but something that is yea far from a machine gun can't be banned, because a lot of them got into common hands before the ban. To be clear, if I understood your hypothetical, I'm sorry if I misunderstood it. If, you know, law changed such that machine guns, automatic technology did become the common choice of the American people without effect. No, no, you're just not listening to my question. I'm asking, Congress banned the machine gun in 1938. What I want to know is whether that is unconstitutional on the ground that today law-abiding people would own machine guns for proper use. The same proper use you describe the AR-15 as having. And I think if a showing could be made that the American people, given the choice, would choose those, then I agree with you that the answer might be different today than it was back in the 1930s. So here's my issue. This may be, I'm not sure if this is what Judge Easterbrook is saying or not, but at least mine. Usually when we are asked to assess the constitutionality of a statute, whether it's under the First Amendment or, you know, any part, your favorite part of the Constitution, these are enduring decisions. They're not decisions that change based on the empirical basis of what has been happening lately. You know, it's okay to say that child pornography is not within the speech protected by the First Amendment. It's not about how popular child pornography is. It's an understanding of what the speech laws mean and what its limitations are. And the same thing is true of the other parts of the Constitution. Indeed, there are people who have argued very strongly that the death penalty must be consistent with the Constitution because it's mentioned a couple of times in the Constitution, even if mores have changed. And a lot of people now think the death penalty is immoral. The way to fix that, people say, is at the ballot box. You can get rid of it. But your interpretation means that constitutionality kind of winks on and off depending on how popular a weapon is at any given time. And that's an unusual position to take. I appreciate that, but I do want to be clear that Bruin actually specifically confronted this question. And it confronted the possibility. No, it didn't. Let me join Judge Wood in saying, Bruin confronted the question that was confronted in Bruin, which had nothing to do with arms like the AR-15. That's why both Justice Kavanaugh and Justice Alito filed separate opinions saying, Bruin decides only what it decides, what it's presented. There wasn't any question in Bruin about what is a protectable arm. It hasn't been decided. Now, maybe we should decide it along similar grounds. But you can't retreat and say, this has all been decided by Bruin. We've got a hard question, and we don't think we can duck it by attributing it to a decision that didn't face the issue. I was not trying to suggest that Bruin decided the question before this court. I simply was – it addressed the question – Though your brief says that. It addresses the question you were asking me, which is a question about whether it matters if something was common now that wasn't common back then. And there is a passage in Bruin when the court specifically says, we accept the proposition that perhaps handguns were considered dangerous and unusual back in colonial days. And the court says, even if that were the case, that would not provide a justification for bans on carrying them today because they are unquestionably in common use today. That's at page 2143 of Bruin. I've read Bruin, too. I'm putting it under my pillow. I appreciate that it is a little bit unusual. It is a little bit unusual to have a protection that comes on and off. But it is more than a little bit unusual. It's very troublesome to have a popularity contest determine a constitutional principle. And so that's why I've been looking throughout these arguments. What is the principle? Is the principle one that allows legislatures to distinguish between military uses and personal uses? Is the principle one that privileges the right to self-defense? Is the principle one you can lift it up? Is it bearable? And I assure you, you and I could carry a grenade around. It's not that hard. And I do want to be clear about the methodology, which is it's a different question whether something is an arm that's presumptively protected and then when you get to historical tradition. We think that the threshold question of whether something is presumptively protected is not that complicated and doesn't need to get into an elaborate historical analysis. The Supreme Court said the definition, they used the word definition, of the term arm is bearable arm. But I'm telling you, you can say that, but then when you try to put some meat on the bones, it's hard because a bearable arm certainly would include the M-16, but the court at the same time said they're outside the scope of the Second Amendment. But I don't think the court was saying they aren't arms. It was saying they are arms that may be banned consistent with our historical tradition of banning arms that are dangerous and unusual. So they passed the threshold test. That's just a question of whether the Second Amendment is even implicated. They failed, the court concluded, at the second test because those kinds of bans are consistent with historical tradition. And it seems to me quite funny. And if the M-16 is dangerous and unusual, it's certainly not any more unusual than the AR-15. Well, it's absolutely in society at large. There's 24 million AR-15s. That's just because the Pentagon says you can't have them. That's the problem. Circularity is – and the whole fact that this is just ripped out of time. The M-16 can't be banned because the Pentagon won't let civilians have it. But that just says that what can be banned depends on what has been banned. And as a matter of normal constitutional analysis, that just doesn't work. I think that the reason we look at things differently in this context is in part because, I mean, this is an amendment that's passed to keep the government from taking things away from people. And so when the government's trying to take arms away from people that they already possess— Well, then you brought the wrong case because Illinois doesn't take any arms away from people. It bans sales of new AR-15s. Illinois is saying that there are arms that you no longer can have, and we are— No, there are arms you can no longer buy, right? We can at least state the statute correctly. You can no longer acquire them, and even people who can keep them can only keep and utilize them under much narrower circumstances than— Only if they fill out this registration form, which is honestly no worse than anything else that people fill out every day. Oh, but there's still significant restrictions on what they can do with them. They can't utilize them like any other— Oh, those restrictions didn't look all that huge to me. You can use them for self-defense. You can take them to a shooting range. You can have them in your car when you're traveling to and fro. There's all kinds of things you could do. We have plaintiffs here who would like to acquire these, and they cannot acquire them. Acquire is just different about, you know, things—an amendment— But that's true of the M-16 as well. Of course it's true. You can't acquire it. Of course it's true. Even if it would be really, really useful for self-defense. Sure, but I don't think the fact that there's some arm out there that is unprotected by the Second Amendment is justification enough to say— No, look, I hope you see why we're having trouble. If you assume that the M-16 is unprotected by the Second Amendment, then of course it's not problematic to ban the M-16. But why are you assuming it's unprotected by the Second Amendment? Only because the military has so far kept them mostly out of civilian hands. And if the military had failed or had waited a decade, then they would be protected by the Second Amendment. And that, as a matter of normal constitutional analysis, would be, let's just say, very unusual. With respect, I disagree that the only reason they can't be protected is because the Pentagon is banned now. If you look at the history here, semi-automatic technology predated automatic technology on the civilian market. It had been around for roughly 30 years. On the civilian market. Sure, but that's the point. Automatic technology was in use in the Civil War. I mean, fully automatic firearms came around around the end of the 1800s, but they weren't available to civilians. And the Second Amendment is about protecting the right of what civilians can do. But whether they are available to civilians is the very question under review. I don't think you're understanding our problem. Your argument seems to be that if the government is successful in preventing weapons from coming into civilian hands, that is a self-fulfilling prophecy. That, therefore, they aren't covered by the Second Amendment. But if the government waits before deciding whether weapons can come into civilian hands, then it becomes disabled from ever making that decision. That, as a matter of normal constitutional analysis, is pretty weird. That just is not our argument. It is not our argument that the reason M-16s may be able to be banned is because they were banned. It's because when they came on the market, people did not choose, law-abiding citizens did not choose impunity as an option. They never came on the private market. They did come on the private market. They came on the private market in 1925. And over the course of the following ten years, instead of a bunch of law-abiding civilians going and buying them, 25 states and the federal government banned them. People reacted by saying these are not the kinds of arms that we want for self-defense. But you would have been bringing a lawsuit saying they shouldn't. This, of course, is during a period when the Second Amendment is understood very differently from the way it's now understood. I mean, not necessarily. I guess if I had some client who wanted them, but most people didn't. They were happy with the semi-automatic technology that had been on the market for 30 years and isn't radically different from anything we're talking about today. People were happy to continue arming themselves with semi-automatic pistols, with essentially semi-automatic revolvers and rifles and shotguns and all those things. They didn't clamor to go get this technology. They were instead a groundswell across the country of people saying, this is not what we want for self-defense. So I don't think you can say that this is just 100%. The Pentagon said you can't have them, and that's the end of it. There was actual history surrounding it, and it was that law-abiding citizens had the option and said, no, thank you. And I think that goes to show that it's not as if anything out there that's legal will necessarily be something millions and millions of Americans go and purchase. When Americans make choices about what to purchase, it just so happens that what the state has decided to try to ban here is the single most popular thing that people are purchasing these days for self-defense. And I don't think that when you're doing that, first the idea that a law prohibiting the second most popular type of arm in this country would not even implicate the Second Amendment. It doesn't even need to be analyzed under history and tradition. I think the Supreme Court would find that proposition absolutely radical. Well, can I also say, I just want to put some perspective here. There's absolutely nothing in the Illinois law or any of the other laws that are before us that would prevent a future legislature in Illinois to allow the purchase of these weapons. And other states have more liberal policies about what – so in other words, there's a democratic process, there's a legislative process at issue here. And what we're exploring is what are the constraints on that process? Has Illinois gone too far or have the various – the county and the two municipalities, have they gone too far? But nobody is preventing anybody from using the legislative process. Sure, but I mean you could say that about pretty much any constitutional right. You can always go and change this. Well, and look at Dobbs. Look at Dobbs. Dobbs says sometimes the right thing to do is to go to the legislative process, go to the states, see what they want. Dobbs certainly does. But the Supreme Court's direction that they've been giving loud and clear in the context of the Second Amendment is that legislatures are overreaching and that the Second Amendment protects a fundamental individual right and that the legislature doesn't get to just come in and say, you know what, these arms, they strike us, it's too dangerous for the average law abiding citizen. And even though millions of law abiding citizens have made a different judgment, we know better. That's not the kind of judgment that is consistent with historical tradition. And ultimately what grew is the one thing it makes absolutely clear is you've got to ground all of this in historical tradition and the state just has not shown, even in their own work. It depends. I mean history is so malleable. And I mean the state would – I imagine they're going to stand up and say, yes we did, yes we did. And which historical analogs are the best ones, which are even legitimate ones, is very much under debate among the parties in this case. It certainly is. But what the state has been careful to continuously say, and it's brief and I've heard them say it again here today, is that they've demonstrated a history of, quote, regulation. Okay, I will grant that there's a history of regulation of all sorts of types of firearms. That is not the same thing as a history of prohibiting particular types of arms on the theory that they are too dangerous to the American people. Except that, I mean we don't need to belabor this because we've covered it, but there are arms that are kept out of civilian hands and those are banned. Sure, but the justification, if you look at the very few and far between laws that ban particular types of arms. Most of the ones that come forward in the 1800s are the exact same laws that Bruin or Heller or both considered and said, these are outliers that are not part of a regime. Why do you describe it as few and far between? I mean take the grenade. The grenade is a very portable, very effective arm. It's banned. I assume that you think that ban is lawful. Stinger missiles, bazookas, it's very easy to rattle off lots of banned arms. So why do you describe them as few and far between? I suppose I should employ the caveat of arms that are commonly owned by law-abiding citizens. Yeah, but we're then back to this circularity. Sure. Grenades aren't commonly owned by law-abiding citizens, in part because they're completely illegal. But once the state is banning things that are commonly owned, I think they need to know what they're banned. Right, and that's the anachronism built into the argument. That if the state waits 20 years before banning something, it can't. But if it bans them right at the beginning, it can. And that's, well, we've been through this. Appreciate the frustration. Okay. It's the anachronism built in. Thank you, Ms. Murphy. Thank you. Mr. Magg. May it please the Court, Counsel, Thomas Magg of the Langley plaintiffs, perhaps I want to start out by saying we're not here talking about rocket launchers and bazookas or the like. Frankly, I'm aware of no law outlawing them. National Firearms Act might tax them. There is, in fact, a specific federal statute about grenades. Also includes body armor and a bunch of other things. A bazooka, they're on the market, they're taxed and registered, as are pre-1986 machine guns, of which there are about 200,000 in civilian hands right now. But we're not here talking about rocket launchers and grenade launchers. In fact, machine guns at the federal level weren't banned until 1986. They were taxed and registered starting in 1934 by the federal government, but remained on the market. The reason that there's only 200,000 machine guns in civilian hands is they're expensive and they were regulated, not banned. What protects the AR-15 and similar firearms, aside from the fact that they are the single most popular firearms in the United States, is that they are also the lineal descendants of the arms, the Charleville Musket, the Brown Bess, used at the time of the adoption of the Second Amendment. You make that argument. I find it less helpful because it just puts too much in the same pot, basically. There are quite important differences between the AR-15 that you could buy if you went out and bought it today and the weaponry that was used at the time of the Revolutionary War. I mean, it just weakens your argument to try to say they're the same thing. I didn't say they're the same thing, I said they're the lineal descendants, such as the difference between the Gutenberg press. But if they aren't the same thing, then why? Yes, okay, the Gutenberg press is different from my iPad. I get that. But why is it helpful to say that it's the lineal descendant? It's different. It's unbelievably dangerous. It is not unbelievably dangerous any more than the bayonet on the end of the British musket. Again, that zooms up to such a high degree of generality. Can they both kill? Sure. Are they both designed for killing? Sure. But they don't kill in the same way, in the same number of seconds, in the same manner. But the progression of technology from the adoption of the Second Amendment has been a progression of improvements in range, in power, speed of firing. The arguments that the state is making about AR-15s and the like could be applied to bolt-action rifles in the First World War. They have an immense rate of fire compared to the Charlottesville musket. But I don't think even this court would blame it saying that they're protected by the Second Amendment. So can I ask you, it seems to me fundamentally your position is that with the addition of the Second Amendment to the Constitution in 1791 and then its later incorporation in 1868, the legislative authorities of this country at any level were across the board simply disabled from banning or regulating guns, firearms. Banning rifles, pistols, shotguns of the type typically used in the adoption of the Second Amendment, yes. Regulating, it depends on how far the regulation goes. So if you can somehow trace a lineal descendant from something that was around 1791 to a modern weapon, no matter how many improvements, as you say, in accuracy, range, etc., there's just no power in Congress, no power in the state legislature or city council to ban that weapon. I agree that the government does not have the power to ban the great-great-grandchildren of the brown bats musket. And doesn't that equally apply to Stinger missiles? Interesting. Stinger missile is not a descendant of a rifle, pistol, shotgun used at the time. It was a descendant of an arm. There's no phrase in the Constitution about rifle, pistol, or shotgun. No. It's a descendant of the kind of missile invented in China in about the 8th century. It ran for a long time. The concrete rocket used by the British at the time of the Revolution, I don't know if that would be protected. And therefore, in your view, is the Stinger missile protected by the Second Amendment? Probably not, because it would be dangerous and unusual. Unusual compared to what? Compared to anything. Even in the military, they don't issue man-packed, man-portable air defense systems like the Stinger missile to the average infantryman. It's like nuclear weapons. Nuclear weapons, even in a military context, are rare and unusual. There might be thousands of them across the nation, but they're certainly not issued and used, at least not used since World War II. And I would note that Centano made clear, 200,000, at least in the concurrence in Centano by Justice Alito, that 200,000 stun guns existed for the record in that case, in the United States at that time. If 200,000 is sufficient for in common use, we're well beyond that. We're talking about tens of millions. I would also like to point out that the issue is not just used for self-defense. It's traditionally used for lawful purposes, including self-defense. Other lawful purposes, target competition, hunting to the extent necessary, and the like, are also traditionally lawful purposes. And in closing, while I still have a little time, I would like to, we're not here just talking about AR-15s and Big Ben assault weapons. You take a little .22 pistol, pocket pistol with a threaded barrel, kind of like the James Bond series in the original Dr. No books, that is banned under this Act. Pocket pistols with threaded barrels. These are not dangerous, unusual new firearms. They are long-existing firearms, millennial descendants of what existed at the time of the Revolution. They are protected. Thank you, Mr. Mayor. Thank you, Your Honors. Mr. Dickey. Good morning, Your Honors, and may it please the Court. Gilbert Dickey on behalf of Appellant Dr. Herrera. Dr. Herrera's challenge is principally about whether he can keep his common rifle and handgun magazines in his home. Ruin's text and history framework confirms that he can. We agree with Ms. Murphy's arguments about common use, but we'd like to highlight three features unique to Dr. Herrera's challenge. First, the history speaks with clarity to Dr. Herrera's challenge to blanket vans in the home. Under the Militia Acts, citizens were expected to keep common weapons that could be used for lawful civilian purposes and common defense in the home. See, with that argument, it's always an interesting argument. It relates back to the Militia Clause, actually, but what I am having trouble with, again, is my sorting question because people could certainly keep an M16 in their home, too, and it would be useful if the militia were called up and if they were training periodically in appropriate ways, they would be ready to go for the militia. So I just don't know why that helps us make the decision that we're trying to make today. Yes, Judge Wood. So when you look at the Militia Acts, as you say, civilians were expected to keep weapons that would be useful for... Certain types of weapons, and they could lose their weapons, too, if they poached or if they, in some fashion, misused them. Yes, and in our case, we point to evidence about the kinds of weapons that those were. Those were the weapons that were in common use for lawful civilian purposes that would also be useful for common defense. And here we actually have record evidence in some of the declarations in our case that the M16 and fully automatic functionality, which is the distinction between the M16 and an AR-15, is not useful for lawful civilian purposes. It would be useful for militia purposes, but Hiller makes clear that alone is not enough. It just strikes me as itsy-bitsy. We say it's not useful for the M16 for civilian purposes, but if somebody was frightened and they thought an intruder was coming to their home, rather than have to sit there and aim at the intruder, maybe if you could just spray weaponry across the area, you'd be even more assured of protecting your home. I certainly understand the challenge you're facing, Judge Wood. And, of course, that's related to the bump stock question where bump stocks are used to make essentially fully automatic applications, which is now, I assume, about to be reviewed by the Supreme Court. Right? If a bump stock is protected by the Second Amendment, why not an M16 or any other machine gun? Your Honor, our argument is not. I know your argument is not about bump stocks, but we live in a world where the Fifth Circuit has just held that bump stocks cannot be outlawed and where the Solicitor General has asked the Supreme Court to review that. Anything we say today will be read against that background, too. So I'm asking whether, in your view, bump stocks and the M16 are protected by the Second Amendment precisely because they can be used to spray bullets. So our view distinguishes between semi-automatic rifles like the AR-15 that Dr. Harrow would like to keep in his home and fully automatic functionality. And that is exactly because fully automatic functionality is designed to, as you mentioned, spray fire, which is useful in the militia setting. And it's useful for somebody who is, say, 75 years old, not very familiar with firearms, confronted by an intruder at home, and would be much more likely to be able to protect himself from the intruder if he could just pull the trigger once and move the gun around. Your Honor, I don't think that's the record in our case. I'm not asking about the record in our case. I'm asking about a feature of an automatic weapon, right? That's how automatic weapons work. It's why the military likes them. It's why a 65-year-old or 80-year-old arthritic homeowner may think it would be terribly important to be able to defend himself that way. I understand you don't want to answer this question. That's exactly why we do want you to answer that question. Right. What I'm trying to point out is we do not believe that that's the kind of lawful civilian use that would be expected under the Militia Act, exactly because, as we've shown, we think it's useful for suppressive fire, but not for self-defense, whereas the semi-automatic— Why? Look, I just told you how it's useful for self-defense. Somebody who is not a gun expert, who might have arthritis, is trying to defend himself, the ability to pull the trigger once and move the gun around is very effective for self-defense, one might think, right? Certainly one might think that. I think the distinction we're trying to draw is— I hate to keep going back to the record, but I think what our expert declaration shows is it's not a useful tool for actually hitting your target and effectively defending yourself, and semi-automatic— It's not a useful tool for hitting your target. If I recall the data, if you think about the military use of the M16, one bullet in more than a hundred hits its target, but the military thinks they're useful. Right. Or you think the military is just wrong in thinking that these kinds of weapons are useful. We've put in evidence from people highly experienced in military operations that the use for it in the military setting is predominantly for suppressive fire. And that's the kind of question I was asking. You're a homeowner. You're worried about the intruder. You just want to make sure that he gets hit somehow without your having to aim the rifle at him. Right. I think that's different from what I'm saying. Suppressive fire is not— I know it's different from what you're saying, but why is it a constitutional rule, right, where why is it that the Constitution prohibits— allows a state to prohibit that kind of use by a law-abiding person to defend his house and does not allow the state to prohibit a similar use by a very similar weapon? Trying to see how the Constitution draws that line has been very difficult. Right. For me at least. I understand. I think our test draws—drawing from the Militia Act draws two distinctions. The guns—and we think at a minimum you cannot show a history and tradition of banning weapons in the home that were useful both for lawful civilian purposes and in common defense. We think the AR-15 is the prototypical weapon that would fit in that. And I think here—I just want to turn briefly if I can to— I think it's important to understand who the Militia was referring to in these Militia Acts. Presser, which we've cited in our brief, makes very clear that the Militia refers to all able-bodied citizens capable of rendering aid in the event of an emergency. And it makes very clear— Able-bodied white, non-Native citizens. I don't believe that's what Presser says. Certainly some of the Militia Acts said that. In 1791? You think they were arming people of other races or the Indigenous folks here? We don't dispute that there would be other constitutional problems with the Militia Acts. We point to Presser, which we think is consistent with what McDonald and Heller say about the Militia, where it clearly defines it as able-bodied citizens and not some state-regulated entity. And in fact, if you look to the Militia Clauses, it's very hard to imagine it being a state-regulated entity because it's actually the United States government that is responsible for organizing the Militia and is the only authority capable of calling forth the Militia. The state's authority is to appoint the officers and to see to training according to the instructions of the United States. So we're not talking about some state-regulated entity. The Militia was a pre-existing body of people before the Constitution composed of all able-bodied citizens. And so we think these Acts show that weapons that were useful for lawful civilian purposes like the AR-15, and that's not just limited to self-defense clearly, but also target shooting and the like, were protected by the Second Amendment. And if you look to Heller, where it discusses, there's been some discussion of sort of a like the M-16 test. What Heller is actually saying is the mere fact that something might be useful for the Militia is not enough. It's actually explaining why despite the usefulness for Militia purposes. So the Militia purpose was cutting the other way there, but it was explaining why when a weapon is highly unusual like the M-16, that's not enough just because it would be helpful for Militia purposes. Just briefly, I want to talk about the district court's irreparable harm finding. ESAIL confirms that Dr. Herrera is suffering irreparable harm. He is currently prohibited from keeping his AR-15 in his home and training with it. Those are the exact harms that were at issue in ESAIL. So we think that was clearly a legal error. If there's nothing further, we would ask that the court reverse. Thank you, Mr. Dickey. Ms. Hunger, anything further? Yes, Your Honor, just a few very brief points. Going back to Your Honor's questions about first principles, our view is that our standard, both of the plain text and the historical tradition, SEP or whatever we would like to call it post-Gruen, is consistent with these first principles because on the one hand, you're looking at whether or not an arm is useful for self-defense, or on the other, whether it is typically used or best used or most suitable for the military or criminal uses. And I think that is consistent both in the plain text and also looking at the historical tradition. How does the plain text answer that? Well, in terms of what an arm means, our view is that the – There's nothing in the plain text that tells you what an arm means. That's correct. So let's stop with this plain text stuff. Okay. My apologies, Your Honor. In terms of first principles, looking at categorization of self-defense on the one hand and military and criminal use on the other hand under kind of a history and tradition, and as Gruen indicated, would govern here. I also would like to note on a different topic, plain text discussed a lot. These firearms are available. They have also been available. But another piece of this story is the marketing techniques. And here, as is clear in the record— I was having a lot of trouble with your adversaries about constitutional history. But I must say, I don't see how marketing techniques have anything to do with the Second Amendment. It's another problem. I don't think it's conceivable. We agree. Yes. Thank you. Thank you. Okay. And then finally, in terms of a few places in the record where you can look to see why the weapons of the 1950s are different from the semi-automatic weapons, I would look to Exhibit B of the Andrew Declaration, which is kind of a contemporaneous report, the Ergolitis Declaration and the Hargarten Declaration. So are we looking at this to shed some light on dangers and unusual, or are we looking at this for some other reason? That would be in response to this notion that the semi-automatic weapons of the 1950s are the same as the semi-automatic weapons of the late 19th century and the early 20th century. And our view is that those are not the same, and that is merely our record. I must say, I don't understand that either. Do you think the famous Winchester repeating rifle is protected by the Second Amendment? In terms of the text or the tradition or just the overall? I'm asking about the bottom line. The text doesn't tell us what an arm is, right? Now I want you to think about the Winchester repeating rifle, right? Not any kind of muzzle-loading rifle as of 1791, right? But the rifle that made the West, the one where you could crank the pump and shoot again much more quickly than anything beforehand,  it was in a sense like its predecessors, but in a sense it was the AR-15 of the day. Was it protected by the Second Amendment? Is it protected by the Second Amendment today? Our view is that certain restrictions may have been lawful, for example, on the concealed carry of those weapons,  which may be different than a complete ban on those weapons, which may not be protected for that purpose. That sounds pretty fuzzy. Is that your final answer? The Supreme Court has said that the restrictions on concealed carry of revolvers and rifles of those types are constitutional, and so it does depend on, I think, what the restriction is. So that is my final answer. I suppose finally, I'm just noting kind of this page 2143 that my opponent spent a good amount of time on, which I've also read quite extensively. Our view of that paragraph is, yes, the Supreme Court did use the word common use. It was in distinguishing, I believe, one or two regulations in its entire historical analysis. It was not establishing the test. And if Your Honors have no further questions, we ask that this Court affirm in Beavis and Herrera and reverse in Barnett. Thank you. Thank you, Ms. Hunker. Ms. Scheller, anything further? Thank you, Your Honor. Nothing further on behalf of the county defendants unless the Court has specific questions. I see none, so thank you. Thanks to all advocates. This is an extremely difficult problem, and we will take the case under review. The Court is in recess.